**IN THE UNITED STATS DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHEYANNE HORNE,** | : | |
| | : | |
| ***Plaintiff*,** | : | |
| | : | **Case No.: 24-1497** |
| **v.** | : | |
| | : | |
| **UPMC d/b/a UPMC CORPORATE SERVICES, UPMC HEALTH PLAN, INC., and UPMC MAGEE-WOMEN'S HOSPITAL, *jointly and severally*,** | : | **COMPLAINT IN CIVIL ACTION** |
| ***Defendants*.** | | |

**COMPLAINT IN CIVIL ACTION**

AND NOW, comes Plaintiff, Cheyenne Horne, by and through the undersigned counsel, J.P. Ward & Associates, LLC, and, specifically, Justin M. Bahorich, Esquire, who files the within Complaint in Civil Action against Defendant, UPMC d/b/a UPMC Corporate Services, UPMC Health Plan, Inc., and UPMC Magee-Women's Hospital, both jointly and severally, of which the following is a statement:

**PARTIES**

1. Plaintiff, Cheyanne Horne (hereafter "Ms. Horne"), is an adult individual who currently resides at 18 Marhoefer Drive, Apt. A, Pittsburgh, PA 15236.

2. Defendant, UPMC d/b/a UPMC Corporate Services ("UPMC Corporate"), is a nonprofit corporation with a principal place of business at 200 Lothrop St., Pittsburgh, PA 15213.

3. Defendant, UPMC Health Plan, Inc. ("UPMC Health Plan"), is a nonprofit corporation with a principal place of business at 600 Grant Street, US Steel Tower, 55th Floor, Pittsburgh, PA 15219.

4. Defendant, UPMC Magee-Women's Hospital (hereinafter "UPMC Magee"), is a nonprofit corporation with a principal place of business at 300 Halket Street, Pittsburgh, PA 15213.

## JURISDICTION AND VENUE

5. Jurisdiction is proper as Plaintiff brings this Complaint in Civil Action under Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C.A. §2000e-2(a)(1) *et seq*.), the Americans with Disabilities Act ("ADA" – 42 U.S.C. §§ 12101, *et seq*.), the Family Medical Leave Act ("FMLA" – 29 U.S.C. § 2601, *et seq*.), and the Pennsylvania Human Relations Act ("PHRA" – 43 Pa. Cons. Stat. § 951 *et seq*.).

## FACTUAL ALLEGATIONS

6. On February 4, 2019, Ms. Horne began working for Defendant UPMC.

7. Ms. Horne is a disabled individual in that she suffers from Complex Post-Traumatic Stress Disorder ("CPTSD"), depression, a panic disorder, Premenstrual Dysphoric Disorder ("PMDD"), and Attention Deficit Hyperactivity Disorder ("ADHD").

8. Ms. Horne's disabilities substantially affect her major life activities, including but not limited to, breathing, concentrating, communicating, sleeping, caring for oneself, eating and performing manual tasks.

9. At all times relevant, Ms. Horne was qualified to perform the essential functions of her job.

**a. Ms. Horne suffered a severe panic attack while at work after encountering her prior assailant and requested reasonable accommodation in the form of a position / department transfer.**

10. On April 16, 2021, Ms. Horne was working in the Magee location when a woman named Desiree Bridges ("Ms. Bridges") entered the outpatient clinic as a patient.

11. Ms. Horne immediately recognized Ms. Bridges because Ms. Bridges had previously threatened to murder her and attempted to physically assault Ms. Horne in or around 2011.

12. Ms. Horne notified her manager, Virginia Rhoades ("Ms. Rhoades"), and Human Resources Representative Joelle Graf ("Ms. Graf") of the prior incident with Ms. Bridges stating that she needed to leave to ensure her own personal safety.

13. Although Ms. Horne believed that she had left without Ms. Bridges seeing her, Ms. Horne received a call from her coworker Tori Gant ("Ms. Gant"), about an hour after leaving, who informed her that Ms. Bridges was walking among the cubicles and stating, "I thought I saw that b***h I tried to kill."

14. This incident triggered the symptoms of Ms. Horne's CPTSD and panic disorder and she became increasingly anxious while at work.

15. As part of Ms. Horne's symptoms, she experienced dizziness, an increased heart rate and blue fingernails.

16. Ms. Horne informed her supervisors of the exacerbation of her disabilities and requested reasonable accommodation in the form of a position transfer to the 5600 unit at Magee.

17. Ms. Horne was informed that another employee had been sent to the 5600 Unit Women with Disabilities Clinic at Magee (hereinafter "5600 Unit") for additional training for a month and that she would get her turn to train in the unit.

18. However, after the other employee completed her training, no other employees were sent to the 5600 Unit.

19. Upon information and belief, Defendant UPMC refused to send any other employees to the 5600 Unit in order to avoid providing Ms. Horne with an accommodation.

20. Ms. Horne was later informed by UPMC's HR contractors, WorkPartners, that UPMC had disclosed Ms. Horne's full name to Ms. Bridges without Ms. Horne's knowledge or permission.

21. Ms. Horne attempted to file a grievance with Defendant's HR department regarding the disclosure of her private information; however, Ms. Graf refused and told Ms. Horne that filing a grievance was not necessary.

22. Subsequently, Ms. Horne dual-filed a Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC").

23. From April to June of 2021, Ms. Horne applied to over one hundred and thirty (130) positions for which she was qualified within Defendant UPMC's organization; however, she was not interviewed for the majority of the positions to which she applied.

24. Upon information and belief, Ms. Horne was blacklisted from these positions in retaliation for her filing a Charge of Discrimination alleging disability discrimination and failure to accommodate.

**b. Ms. Horne was discriminated against by Defendants on the basis of her pregnancy and pregnancy-related disability.**

25. On July 20, 2021, Ms. Horne discovered that she was pregnant.

26. On August 14, 2021, Ms. Horne began a new remote position with Defendant UPMC Health Plan as a Clinical Operations Representative.

27. On August 19, 2021, Ms. Horne was admitted to Magee and diagnosed with Hyperemesis Gravidarum ("HG"), which is a condition in pregnancy that causes severe vomiting, dehydration and weight loss.

28. Ms. Horne's HG substantially affected her major life activities, including but not limited to, eating, drinking, maintaining her weight, digestion and sleeping.

29. Defendant was aware of Ms. Horne's pregnancy and HG diagnosis and provided her with medical accommodation for her condition.

30. Between August 19, 2021, and September 16, 2021, Ms. Horne was hospitalized on two separate occasions for periods of three to four days due to her HG.

31. During this period, Ms. Horne experienced issues with her home office equipment provided by Defendant UPMC Health Plan, which was necessary for Ms. Horne to perform her remote work tasks.

32. Although Defendant UPMC Health Plan was aware that Ms. Horne was unable to drive due to her medical condition, she was forced to come into the office on three (3) different occasions to fix the equipment.

33. Ms. Horne's supervisor, Karen Sinipoli ("Ms. Sinipoli"), accused Ms. Horne of trying to get time off, even though Defendant's IT Helpdesk confirmed that there was an issue with the Tower system and that there was nothing Ms. Horne could have done to cause the issue.

34. On September 16, 2021, Ms. Horne attended a virtual doctor's appointment for her pregnancy.

35. The same day, Ms. Sinipoli called Ms. Horne and berated her for missing so much work, despite Ms. Horne's medical accommodation.

36. During the phone call, Ms. Sinipoli asked Ms. Horne to resign from her position to "focus on her pregnancy," stated that she had "quotas to fill," and threatened Ms. Horne with termination.

37. When Ms. Horne told Ms. Sinipoli that she would not resign, Ms. Sinipoli stated that she "was forced to take the next steps" in terminating Ms. Horne's employment.

38. The stress of the phone call with Ms. Sinipoli caused Ms. Horne to experience a panic attack.

39. Following the phone call, Ms. Horne called her OB-GYN, Carrie Weaver PA-C ("Dr. Weaver"), who instructed Ms. Horne to file a complaint against Ms. Sinipoli with HR due to her highly inappropriate and discriminatory threats.

40. Dr. Weaver stated that she did not feel that medical leave was necessary, but that she was willing to put Ms. Horne on FMLA leave in order to protect her job until Ms. Horne reached twenty (20) weeks into her pregnancy, or until the symptoms of her HG subsided and became manageable.

41. Ms. Horne then contacted her HR representative, Anna Scofield ("Ms. Scofield") to report the incident with Ms. Sinipoli.

42. Additionally, Ms. Horne contacted her team lead, Dorian LNU, who apologized and advised that Ms. Sinipoli "does that often" and told Ms. Horne to take a deep breath.

43. Subsequently, Ms. Horne was put on short-term disability leave until the end of November of 2021, when she was supposed to return to work part-time with accommodation for the first week to evaluate the impact of her HG symptoms.

44. During Ms. Horne's hospital stay on or around November 16, 2021, she sent an email to Ms. Sinipoli requesting to transfer to a new position due to the prior incident on September 16, 2021.

45. Ms. Sinipoli initially agreed, but thereafter refused to respond to supervisors who requested proof of her approval for Ms. Horne to interview for new positions.

46. Ms. Sinipoli's refusal to respond interfered with and delayed Ms. Horne's ability to obtain a new position and constituted an act of retaliation against Ms. Horne for her filing an HR complaint against Ms. Sinipoli.

47. Moreover, Ms. Horne applied to approximately fifty (50) positions and was denied during multiple interviews on the basis that she was thirty (30) weeks pregnant and on a leave of absence.

48. Specifically, whenever Ms. Horne would indicate that she was pregnant during the application process, she would be designated "not in consideration."

49. During Ms. Horne's search for a new position, she attempted to return to work with an agreed upon accommodation for her HG.

50. With the approval of UPMC WorkPartners, Ms. Horne presented three (3) options for her request for accommodation upon returning to work, all of which were denied by UPMC Health Plan with no explanation.

51. Ms. Horne's UPMC disability specialist, Jason Berg ("Mr. Berg"), informed her that UPMC Health Plan would not accommodate her and did not want her to return to her position, meaning that Ms. Horne was forced to search and apply for a new position.

52. Mr. Berg also informed Ms. Horne that no alternative accommodation had been recommended by UPMC, constituting a failure to engage in the interactive process.

53. Additionally, Ms. Horne observed that her position was posted on UPMC's career website.

54. Upon information and belief, Defendant UPMC Health Plan's refusal to allow Ms. Horne to return to her position and blanket denial of all requests for accommodation was retaliation

for her engagement in protected activities, including filing an HR complaint against Ms. Sinipoli, requests for accommodation and medical leave.

55. Ms. Horne remained on short-term disability leave until January 28, 2022, during which time she sought a new position with UPMC.

56. At this time, HR Representative Bert Smith ("Mr. Smith") informed her that her employment would be terminated if she did not find another job by March 17, 2022, because long-term leave would not cover her post-partum.

57. Mr. Smith stated that there was nothing he could do if Defendant UPMC Health Plan did not allow her to return to work.

**c. Defendants retaliated against Ms. Horne due to her complaints of discrimination, requests for accommodation and protected leave.**

58. On January 30, 2022, Ms. Horne assumed her new position as an Account Representative Senior ("ARS") with the Previous Day Filing unit with Defendant UPMC Corporate Services.

59. During the interview process for this position, Ms. Horne did not mention that she was pregnant due to her previous denial for positions, and she was ultimately offered the position.

60. On March 14, 2022, Ms. Horne gave birth to her son, and she remained on maternity leave until April 22, 2022.

61. Following Ms. Horne's pregnancy, she was diagnosed with post-partum HG and a flare up of PMDD, which required her to remain on leave until her doctor's appointment scheduled for June 15, 2022.

62. Accordingly, Ms. Horne requested Accommodated Time Away from Work ("ATW") leave from April 22, 2022, through June 16, 2022, because she was forced to use the entirety of her FMLA leave prior to her maternity leave.

63. However, unbeknownst to Ms. Horne, Defendant UPMC Corporate Services denied her request for ATW, claiming that they never received her paperwork.

64. Ms. Horne was unaware of the denial because Defendants failed to inform her.

65. On June 8, 2022, Ms. Horne filed a second Charge of Discrimination with the EEOC and PHRC alleging that Defendant UPMC Health Plan discriminated and retaliated against her on the basis of her pregnancy, disabilities and requests for accommodation.

66. Following Ms. Horne's return to work on June 15, 2024, she appealed the denial of her FMLA request and was retroactively awarded two weeks of paid leave.

67. Defendant UPMC Corporate Services informed Ms. Horne that she would still be marked absent for the period between April 22, 2024, and June 15, 2024.

68. Upon information and belief, Defendant refused to correct Ms. Horne's absences in retaliation for her filing a second Charge of Discrimination with the EEOC and PHRC and engaging in protected activity, including but not limited to, requesting maternity leave.

**d. In her new position, UPMC continued to disregard Ms. Horne's requests for accommodation for her disabilities.**

69. When Ms. Horne began her new position with UPMC Corporate Services, she informed her supervisor, Ashley Hansen ("Ms. Hansen"), and her director, Brenda Fraas ("Ms. Fraas"), that she was diagnosed with PTSD and requested that they inform her of the subject matter of a meeting prior to being sent an invitation to the meeting to avoid triggering her anxiety.

70. However, Ms. Hansen and Ms. Fraas continuously disregarded Ms. Horne's request and repeatedly invited her to meetings without informing her of the subject matter beforehand.

71. As a result, Ms. Horne experienced increased anxiety prior to each meeting.

72. Ms. Horne could have been reasonably accommodated if not for Defendant UPMC Corporate's failure to engage in the interactive process in good faith.

**e. Defendants deprived Ms. Horne of opportunities for career advancement in retaliation for her complaints of discrimination.**

73. While working in her position as ARS, Ms. Horne expressed her intent to attend nursing school to Defendant UPMC Corporate and shadowed as a nursing assistant in several of UPMC's departments in November and December of 2022. Defendant UPMC Corporate failed to pay Ms. Horne for the time that she spent shadowing.

74. In December of 2022, Ms. Horne informed Ms. Fraas and Ms. Hansen that she had accepted an offer for a moonlighting position as a Patient Care Technician ("PCT") in Defendant UPMC Magee's Antepartum Department.

75. Ms. Fraas and Ms. Hansen told Ms. Horne that she would have to take eighty (80) hours of paid time off ("PTO").

76. Ms. Horne advised that she did not have eighty (80) hours of PTO accrued, but that she would be willing to take the time off unpaid.

77. Ms. Fraas and Ms. Hansen denied Ms. Horne's request to take time off unpaid and instructed her to retract her acceptance. Accordingly, Ms. Horne retracted her acceptance.

78. Ms. Horne was later informed by Senior Director Frances Voelker that she should have been approved for unpaid time off; however, it was too late for Ms. Horne to accept the offer as the position had been filled.

79. Upon information and belief, Ms. Fraas and Ms. Hansen prevented Ms. Horne from advancing as a PCT in retaliation for her complaints of discrimination against Defendant UPMC Health Plan.

80. On January 11, 2023, Ms. Horne attended an interview via a video call for a Billing Specialist position, which was the next logical step in her career.

81. Prior to the interview, Ms. Horne advised the interviewer, Mary Lynn Craig ("Ms. Craig"), that she did not have alternative care scheduled for her children because she was not scheduled to work that day. Ms. Craig stated that it was fine.

82. Throughout the interview, Ms. Horne's children were crying in the background and Ms. Horne apologized for the noise and offered to reschedule. However, Ms. Craig continued the interview.

83. On January 12, 2023, Ms. Horne received a message from Ms. Hansen, asking if Ms. Horne's mother still watched her children while she worked.

84. That same day, Ms. Fraas scolded Ms. Horne in a video meeting for having a noisy work environment and advised her that she should put her children in daycare.

85. Upon information and belief, Ms. Lynn told Ms. Fraas that Ms. Horne's children were crying during the interview, although Ms. Horne had advised her that she had not scheduled childcare because it was her day off, and she had even offered to reschedule the meeting.

86. Ms. Horne was not offered the position although she was fully qualified.

87. Upon information and belief, Ms. Horne would have been offered the position but for her ongoing childcare obligations.

88. Ms. Horne's similarly situated male counterparts were not scolded for having childcare obligations.

89. Although Ms. Horne held multiple positions with Defendants and was assigned a new HR Representative each time she transferred to a new role, Defendants continuously reassigned Ms. Graf as Ms. Horne's HR Representative.

90. Ms. Horne requested a new HR Representative from Defendants considering that Ms. Graf was involved in her complaints and charges against Defendants, and she suspected Ms. Graf was retaliating against her.

91. However, Defendants failed to assign Ms. Horne a different HR Representative.

92. From around January of 2023 through March of 2024, Ms. Horne applied for multiple positions with Defendants and attended several interviews.

93. Although Ms. Horne was regularly told that she was a perfect fit for the position in interviews, Defendants regularly did not extend the offer of employment to Ms. Horne.

94. Upon information and belief, Ms. Graf was pausing Ms. Horne's applications in retaliation for Ms. Horne's complaints and charges of discrimination.

**f. Defendants wrongfully terminated Ms. Horne's employment while she was on FMLA leave.**

95. On January 6, 2024, Ms. Horne began a moonlighting position as a Health Unit Coordinator with Defendant UPMC Magee in the Emergency Room while she maintained her position with UPMC Corporate.

96. In February of 2024, Ms. Horne developed a severe case of bronchitis and an ear infection, which caused deafness and required surgery.

97. Accordingly, Ms. Horne was approved to take FMLA leave from February 19, 2024, to April 19, 2024.

98. On February 20, 2024, Ms. Horne interviewed with Defendant UPMC Magee for a Nursing Assistant position. During the interview, Ms. Horne requested to work weekend shifts only so that she could care for her children during the week. The interviewer assured Ms. Horne that she would only work weekend shifts.

99. On March 6, 2024, Defendant UPMC Magee offered Ms. Horne the position which Ms. Horne accepted.

100. However, on March 12, 2024, Ms. Horne retracted her acceptance due to personal reasons via text to Ashley Hanson.

101. On March 19, 2024, Ashley Hanson notified Ms. Horne that her position was eliminated entirely. Upon information and belief, Defendants permitted other employees to return to their previous positions after the employee retracted their acceptance to transfer to a different position.

102. To Ms. Horne's surprise, Ms. Hansen informed Ms. Horne that Defendant UPMC Corporate had eliminated her position while she was on FMLA leave and instructed her to return her equipment on April 5, 2024.

103. Because Ms. Horne's moonlighting position was contingent on her full-time position with Defendant UPMC Corporate, the elimination of her position meant she would also lose her moonlighting position.

104. HR Representative Jacklyn Betts ("Ms. Betts") informed Ms. Horne that Defendant's HR Department would assist her in finding a new full-time role.

105. That same day, Ms. Horne called Ms. Graf, who informed her that her employment was not being terminated, but that her positions were only protected until her FMLA leave lasted.

106. On April 5, 2024, Ms. Horne's husband returned her equipment to Defendant UPMC Corporate on her behalf.

107. That same day, Ms. Horne spoke with her supervisor at UPMC Magee, who informed her that HR was not allowing them to convert Ms. Horne's moonlighting position to a casual position, which would allow Ms. Horne to remain employed by Defendants.

108. On April 6, 2024, Ms. Horne attempted to log in to her employment portal but was unable to gain access.

109. Upon information and belief, Defendants terminated Ms. Horne in their system despite Ms. Graf's statement that Ms. Horne's employment was protected until the end of her FMLA leave on April 19, 2024.

110. On April 8, 2024, Ms. Horne called Ms. Graf and discussed her frustration with being unable to find a new position with Defendants' organization.

111. Ms. Horne expressed to Ms. Graf that Defendants were retaliating against her for her previous complaints of discrimination.

112. Immediately following her call with Ms. Graf, Ms. Horne received a call from someone purporting to be Defendant's Head of Patient Access. The person stated that she had just spoken with Ms. Graf and informed Ms. Horne that "there are no positions available for you [Ms. Horne] at UPMC."

113. On April 19, 2024, Ms. Horne's FMLA leave expired and on April 23, 2024, Ms. Hansen terminated Ms. Horne's employment via email.

114. Upon information and belief, Defendant UPMC Corporate eliminated Ms. Horne's position and effectively terminated her employment in retaliation for her use of FMLA leave and her complaints of discrimination.

115. While Defendant designated Ms. Horne having resigned from her position, Ms. Horne was effectively terminated by the elimination of her position and blacklisted in her attempts to secure a new position.

116. Due to Defendants' discriminatory and retaliatory actions, Ms. Horne suffered severe financial harm and was forced to sell her house and move to an apartment.

117. Additionally, Defendants have continued their pattern of retaliation against Ms. Horne by appealing her unemployment benefits.

## COUNT I
## GENDER DISCRIMINATION ON THE BASIS OF PREGNANCY IN VIOLATION OF TITLE VII AND AS AMENDED BY THE PREGNANCY DISCRIMINATION ACT ("PDA")

*(Plaintiff v. Defendant UPMC Health Plan)*

118. Ms. Horne incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

119. Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual… because of such individual's race, color, religion, sex, or national origin;" 42 U.S.C. §2000(e-1) (a)(1). Further, Title VII dictates that "[t]he terms 'because of sex;' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment related purposes…" 42 U.S.C. §2000(e-1)(k)

120. Further, the Pregnancy Discrimination Act ("PDA") prohibits—as a form of sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII")—adverse employment actions based on:

a. Current Pregnancy;

b. Past Pregnancy; and/or

c. Potential or intended pregnancy; and or medical conditions related to pregnancy, and/or childbirth.

42 U.S.C. § 2000e(k); *Doe v. C.A.R.S. Prot. Plus, Inc*., 527 F.3d 358, 364 (3d Cir.), order clarified, 543 F.3d 178 (3d Cir. 2008).

121. In order for Ms. Horne to establish a prima facie case of pregnancy discrimination, she must demonstrate that: (1) she was pregnant and the employer knew it; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) some nexus existed between her pregnancy and the adverse employment action. *Neidigh v. Select Specialty Hosp. McKeesport,* 664 Fed. Appx. 217, 221 (3d Cir. 2016) (citing *Doe v. C.A.R.S. Protection Plus, Inc*., 527 F.3d 358, 365 (3d Cir. 2008)).

122. Defendant constituted an employer within the meaning of Title VII.

123. Ms. Horne constituted an employee within the meaning of Title VII.

124. Ms. Horne was pregnant and informed her relevant supervisors.

125. Ms. Horne was qualified for her position and able to perform the essential functions of her position.

126. In August of 2021, Ms. Horne was diagnosed with Hyperemesis Gravidarum ("HG"), a condition arising out of her pregnancy, which forced her to be hospitalized on two separate occasions.

127. Ms. Horne continued to make Defendant UPMC Health Plan aware of her pregnancy and medical condition.

128. On September 16, 2021, Ms. Horne's supervisor, Ms. Sinipoli, instructed Ms. Horne to resign from her position to "focus on her pregnancy" and threatened Ms. Horne with disciplinary action if she did not comply.

129. Subsequently, Ms. Horne took short-term disability leave due to her HG.

130. While Ms. Horne was on short-term disability leave, Defendant UPMC Health Plan informed her that she could not return to her position, effectively terminating her employment.

131. Defendant UPMC Health Plan's adverse employment action against Ms. Horne was directly connected with her pregnancy due to it being fully aware of her condition.

132. As a direct result of Defendant UPMC Health Plan's unlawful acts, Ms. Horne suffered damages.

133. The actions of Defendant UPMC Health Plan were intentional, knowing, and in reckless disregard to the rights of Plaintiff.

134. As a direct and proximate result of the aforementioned conduct, Ms. Horne suffered actual damages, including, but not limited to, lost wages, emotional distress all in the past present and future.

WHEREFORE, Plaintiff, Cheyanne Horne, hereby requests that this Honorable Court enter judgment in her favor, and against Defendant UPMC Health Plan, including an award of back pay, front pay, compensatory damages, punitive damages, injunctive relief, costs and attorney's fees, in addition to such other relief as deemed just and proper.

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII AND AS AMENDED BY THE PREGNANCY DISCRIMINATION ACT

*(Plaintiff v. All Defendants, jointly and severally)*

135. Ms. Horne incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

136. In order for a plaintiff to establish a prima facie case of retaliation under Title VII, she must demonstrate "(1) that she engaged in a protected activity, which can include informal protests of discriminatory employment practices such as making complaints to management; (2) adverse action by the employer either after or contemporaneous with the employee's protected

activity; and (3) a causal connection between the protected activity and the adverse action. *Moore v. Secretary U.S. Department of Homeland Security*, 718 Fed.Appx. 164, 167 (3d Cir. 2017) (citing *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)).

137. In order to establish that an employee engaged in a protected activity, a plaintiff is required to inform the employer of "the particular type of discrimination at issue." *Middleton v. Deblasis*, 844 F. Supp. 2d 556, 569 (E.D. Pa. 2011) (citing *Sanchez v. SunGard Availability Servs., LP*, 362 Fed.Appx. 283, 288 (3rd Cir.2010); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)).

138. Ms. Horne constituted an employee within the meaning of Title VII.

139. In August of 2021, Ms. Horne was diagnosed with Hyperemesis Gravidarum ("HG"), a condition arising out of her pregnancy, which forced her to be hospitalized on two separate occasions.

140. Ms. Horne continued to make Defendant UPMC Health Plan aware of her pregnancy and medical condition.

141. On September 16, 2021, Ms. Horne's supervisor, Ms. Sinipoli, instructed Ms. Horne to resign from her position to "focus on her pregnancy" and threatened Ms. Horne with disciplinary action if she did not comply.

142. Subsequently, Ms. Horne took short-term disability leave due to her HG.

143. While Ms. Horne was on short-term disability leave, Defendant UPMC Health Plan informed her that she could not return to her position, effectively terminating her employment unless she found an alternative position.

144. The adverse employment action was directly connected with Ms. Horne's pregnancy due to Defendants being fully aware of her condition. Defendant UPMC Health Plan decided to terminate Ms. Horne instead of accommodating her and the symptoms of her pregnancy.

145. On June 8, 2022, Ms. Horne dual filed a Charge of Discrimination with the EEOC and PHRC, alleging Defendants discriminated against her due to her pregnancy and pregnancy-related disability.

146. Following Ms. Horne's complaint, Defendant UPMC Corporate retaliated against her by preventing her from pursuing opportunities for career advancement with UPMC. Specifically, Ms. Graff repeatedly paused Ms. Horne's applications without her knowledge.

147. In April of 2023, Defendants UPMC Corporate and UPMC Magee terminated Ms. Horne's employment by eliminating her position.

148. Ms. Horne believes, and therefore avers, that she was unlawfully terminated in retaliation for her attempt to engage in protected activity of reporting pregnancy discrimination in violation of Title VII.

149. The actions of Defendants were intentional, knowing, and in reckless disregard to the rights of Plaintiff.

150. As a direct and proximate result of the aforementioned conduct, Ms. Horne suffered actual damages, including, but not limited to, lost wages, emotional distress all in the past present and future.

WHEREFORE, Plaintiff, Cheyanne Horne, hereby requests that this Honorable Court enter judgment in her favor and against Defendants, jointly and severally, including an award of backpay, front pay, compensatory damages, punitive damages, injunctive relief, costs and attorney's fees, in addition to such other relief as deemed just and proper.

**<u>COUNT III</u>**
**DISCRIMINATION IN VIOLATION**
**OF THE ADA AND THE PHRA**
*(Plaintiff v. Defendant UPMC Health Plan)*

151. Ms. Horne incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

152. The inquiry into whether a person is disabled under the ADA is made on a case-by case analysis. *EEOC v. Grane Healthcare Co.*, 2 F. Supp. 3d 667, 694 (W.D. Pa. 2014); *Chedwick v. UPMC*, 2011 U.S. LEXIS 43239 *35 (W.D. Pa. 2011). To establish a prima facie case of discrimination under the ADA, Plaintiff must show: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of his job, with or without reasonable accommodations by the employer; and (3) she suffered an otherwise adverse employment decision as a result of discrimination. *See McGarvey v. Te Connectivity, Ltd.*, 2018 U.S. Dist. LEXIS 124788 *15 (M.D. Pa. 2018); *Northern v. Susquehanna Univ.*, 2018 U.S. Dist. LEXIS 214349 *28 (M.D. Pa. 2018).

153. Under the ADA, an individual has a disability if she: (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. *Thomas v. Trs. Of the Univ. of Pa.*, 2020 U.S. Dist. LEXIS 11056 *9 (E.D. Pa. 2020) (quoting *Lackey v. Heart of Lancaster Reg'l Med. Ctr.*, 704 F. App'x 41, 48 (3d Cir. 2017)).

154. Under the ADAAA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Berkowitz v. Oppenheimer Precision Prods.*, 2014 U.S. Dist. LEXIS 152533 at *8-9 (E.D. Pa. Oct. 28, 2014).

155. Further, "courts interpreting the Act in light of the 2008 amendments have found that complications arising out of pregnancy can constitute disability sufficient to invoke the ADA". *Oliver v. Scranton Materials, Inc.*, No. 3:14-CV-00549, 2015 WL 1003981, at *7 (M.D. Pa. Mar. 5, 2015).

156. Therefore, due to Ms. Horne's diagnosis of HG, which affected her major life activities, Ms. Horne was disabled and/or regarded as disabled within the meaning of the ADA.

157. Ms. Horne's superiors were made aware of her disability stemming from complications in her pregnancy.

158. Ms. Horne was highly qualified to perform the necessary functions of her position and would have been able to return to work in November 2021, with accommodations.

159. Defendant UPMC Health Plan learned about Ms. Horne's disability and regarded her as too disabled and therefore incapable of performing the essential functions of her position.

160. Defendant UPMC Health Plan effectively terminated Ms. Horne's employment because Ms. Sinipoli regarded her as disabled and assumed that her personal medical needs would unduly burden Defendant UPMC Health Plan.

161. The actions of Defendant were intentional, knowing, and in reckless disregard to the rights of Plaintiff.

162. As a direct and proximate result of the aforementioned conduct, Ms. Horne suffered actual damages, including, but not limited to, lost wages, emotional distress all in the past present and future.

WHEREFORE, Plaintiff, Ms. Horne, hereby requests that this Honorable Court enter judgment in her favor and against the Defendant, including an award of backpay, front pay,

compensatory damages, punitive damages, injunctive relief, costs and attorney fees, in addition to such other relief as deemed just and proper.

**COUNT IV**
**RETALIATION IN VIOLATION OF THE ADA AND THE PHRA**
*(Charging Party v. Defendant UPMC Health Plan)*

163. Ms. Horne incorporates the allegations contained in the paragraphs above as if fully set forth at length herein.

164. The ADA prohibits employers from retaliating against employees. 42 U.S.C. § 12203(a). To establish a claim for retaliation, Plaintiff must prove: (1) a protected employee activity; (2) an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004); *Lackey v. Heart of Lancaster Regl. Med. Ctr.*, 704 Fed. Appx. 41, 49–50 (3d Cir. 2017).

165. Ms. Horne engaged in a protected employee activity when she made Ms. Sinipoli and Defendant UPMC Health Plan fully aware of her diagnosis of HG and her need for reasonable accommodation to take short-term disability leave.

166. While Ms. Horne was on short-term disability, Defendant UPMC Health Plan notified her that it did not want her to return to work, effectively terminating her employment.

167. Defendant UPMC Health Plan's adverse action occurred within close temporal proximity with Ms. Horne's protected activity.

168. Defendant UPMC Health Plan's actions were retaliatory and bear a causal connection with Ms. Horne's real and/or potential needs of reasonable accommodation(s).

169. The actions of Defendant were intentional, knowing, and in reckless disregard to the rights of Plaintiff.

170. As a direct and proximate result of the aforementioned conduct, Ms. Horne suffered actual damages, including, but not limited to, lost wages, emotional distress all in the past present and future.

WHEREFORE, Plaintiff Ms. Horne, hereby requests that this Honorable Court enter judgment in her favor and against the Defendant, including an award of backpay, front pay, compensatory damages, punitive damages, injunctive relief, costs and attorney's fees, in addition to such other relief as deemed just and proper.

**COUNT V**
**FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA AND THE PHRA**
*(Plaintiff v. Defendants UPMC Health Plan & UPMC)*

171. Ms. Horne incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

172. To prevail on a claim of failure to accommodate, Plaintiff must establish that "(1) the employer knew about her disability; (2) she requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist her in seeking accommodations; and (4) she could have been reasonably accommodated but for the employer's lack of good faith." *Tourtellotte v. Eli Lily & Co.*, 636 F.App'x 831, 849 (3d Cir. 2016) (internal citations omitted).

173. Defendants were informed of and knew about Ms. Horne's pregnancy-related disability.

174. Ms. Horne requested occasional days off when she needed to be admitted to the Emergency Room to treat her HG.

175. Following Ms. Horne's hospitalizations, Ms. Sinipoli asked her to resign and threatened termination of Ms. Horne's employment if she did not comply.

176. As a result, Ms. Horne was forced to take short-term disability leave to protect her employment.

177. Defendants did not make a good faith effort to assist Ms. Horne in seeking accommodations and instead forced her to take short-term disability leave or face termination of her employment.

178. Ms. Horne could have been reasonably accommodated but for Defendant UPMC Health Plan's lack of good faith.

179. Defendants were informed of and knew about Ms. Horne's CPTSD diagnosis.

180. Ms. Horne requested that her supervisors inform her of the subject matter of meetings before inviting her to them.

181. Defendants did not make a good faith effort to assist Ms. Horne in seeking accommodations and instead continued to invite her to meetings without informing her of the subject matter.

182. Ms. Horne could have been reasonably accommodated but for Defendants' lack of good faith.

183. As a direct and proximate cause of the conduct, Ms. Horne suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

184. As set forth hereinabove, Defendants' actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience, such that the imposition of punitive damages are appropriate.

WHEREFORE, Plaintiff, Ms. Horne, hereby requests that this Honorable Court enter judgment in her favor and against the Defendants, jointly and severally, including an award of backpay, front pay, compensatory damages, punitive damages, injunctive relief, costs and attorney's fees, in addition to such other relief as deemed just and proper.

**COUNT V**
**SEX AND CAREGIVER DISCRIMINATION**
**IN VIOLATION OF TITLE VII AND THE PHRA**
*(Plaintiff v. Defendant UPMC)*

185. Ms. Horne incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

186. For a Title VII claim, a plaintiff must show: "(1) she is a member of a protected class; (2) she was qualified for the position she sought to attain or retain; (3) she suffered an adverse employment action; and (4) either similarly-situated non-members of the protected class were treated more favorably or the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Langley v. Merck & Co.*, 186 Fed Appx. 258 (3d Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 36 L. E.D. 29 668 (1973). *See also Makky v. Chertoff*, 542 F.3d 205, 214 (3d Cir. 2008).

187. The analytical framework used to evaluate a claim under the PHRA is effectively indistinguishable from that under Title VII. *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999).

188. Ms. Horne was an employee under Title VII and the PHRA.

189. Defendant is an employer under Title VII and the PHRA.

190. Ms. Horne is a woman and the primary caregiver for her two children.

191. Ms. Horne was qualified for the essential job duties of the position for which she applied.

192. Ms. Horne attended a virtual interview on her day off during which her children were noisy in the background.

193. The next day, Ms. Fraas scolded Ms. Horne for having her children at home during the interview and suggested that she enroll her children in daycare.

194. Ms. Horne was not offered the position for which she interviewed despite being fully qualified.

195. These adverse actions against Ms. Horne were motivated by the sex-based stereotype that mothers are "insufficiently devoted to work, and that work and motherhood are incompatible." *Back v. Hastings On Hudson Union Free School District*, 365 F.3 107, 121 (2d. Cir. 2004) (citing *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721 (2003)).

196. Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

197. As a direct and proximate cause of the aforementioned conduct, Ms. Horne suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present, and future.

WHEREFORE, Plaintiff, Ms. Horne, hereby requests that this Honorable Commission enter judgment in her favor and against Defendant, including an award of backpay, front pay, compensatory damages, punitive damages, injunctive relief, costs and attorney's fees, in addition to such other relief as deemed just and proper.

**COUNT VI**
**FMLA RETALIATION AND INTERFERENCE**
*(Plaintiff v. Defendant UPMC)*

198. Ms. Horne incorporates the allegations contained in the paragraphs above as fully set forth herein.

199. The FMLA provides in pertinent part, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" these rights, violation of which is known as FMLA retaliation. *Lichtenstein v. U. of Pittsburgh Med. Ctr.*, 691 F.3d 294, at 307 (3d Cir. 2012) (citing to 29 U.S.C. § 2615(a)(1)).

200. The Department of Labor defines an "employer" under the FMLA as including "any person acting, directly or indirectly, in the interest of a covered employer to any of the employees of the employer, any successor in interest of a covered employer, and any public agency." 29 C.F.R. § 825.104(a).

201. "The regulations then explicitly provide that 'individuals such as corporate officers acting in the interest of an employer are individually liable for any violations of the requirements of FMLA." *Haybarger v. Lawrence County Adult Prob. & Parole*, 667 F.3d 408, 414 (3d Cir. 2012) (quoting 29 C.F.R. § 825.104(d)).

202. In order to demonstrate a claim for FMLA interference, a Plaintiff must establish: "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014) (citing to *Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F.Supp.2d 405, 446 (W.D. Pa. 2008); see also, *Sommer v. The Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006)).

203. Moreover, an employee does not need to prove that invoking FMLA rights was the sole or most important factor upon which the employer acted." *Lichtenstein v. U. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3rd Cir. 2012).

204. Under this regulatory interpretation, employers are barred from considering an employee's FMLA leave "as a negative factor in employment actions such as hiring, promotions, or disciplinary actions." *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005).

205. Defendants are qualified employers under the FMLA.

206. As an employee of Defendants, Ms. Horne was entitled to leave pursuant to the FMLA.

207. Ms. Horne requested and was granted FMLA leave for the period of February 19, 2024 to April 19, 2024—approximately eight (8) weeks.

208. Defendant UPMC retaliated against Ms. Horne for exercising her rights under the FMLA by eliminating her moonlighting position in the midst of her FMLA leave, instructing Ms. Horne to return her equipment.

209. Because Ms. Horne's moonlighting position was contingent on her full-time position with Defendant UPMC Corporate, the elimination of this corporate position also indicated the loss of her moonlighting position, thus, effectively terminating her employment.

210. Upon information and belief, Defendants terminated Ms. Horne in their system despite Ms. Graf's statement that Ms. Horne's employment was protected until the end of her FMLA leave on April 19, 2024.

211. As a direct and proximate result of Defendants aforementioned conduct, Ms. Horne suffered actual damages including but not limited to lost wages, benefits, severe emotional distress and anxiety, and acute inconvenience all in the past, present, and anticipated future.

212. As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff hereby requests that this HONORABLE Court consider the above and grant relief in her favor against Defendants, jointly and severally, and award her back pay, front pay, compensatory and punitive damages, pre-judgement and continuing interest as calculated by the Court, and reasonable attorney's fees.

**JURY TRIAL DEMANDED.**

Dated: October 30, 2024

Respectfully submitted,

**J.P. WARD & ASSOCIATES, LLC**

____________________________
Justin M. Bahorich, Esq.
(Pa. I.D. No. 329207)

J.P. Ward & Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206
(412) 545-3016
jbahorich@jpward.com

*Counsel for Plaintiff*